**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jacqulline Michelle Quintero,<br><br>  Plaintiff,<br>vs.<br><br>Commissioner of Social Security Administration,<br><br>  Defendant. | No. CV-22-00853-PHX-SPL<br><br>**ORDER** |

Plaintiff Jacqulline Michelle Quintero ("Plaintiff") seeks judicial review of the denial of her application for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). Before the Court are Plaintiff's Opening Brief (Doc. 12), Defendant Commissioner of Social Security Administration's ("Defendant") Response Brief (Doc. 16), and Plaintiff's Reply Brief (Doc. 17). Upon review, the Court reverses the Administrative Law Judge's ("ALJ") decision (AR[1] at 21–42) and remands for further proceedings.

**I.     BACKGROUND**

On July 30, 2019, Plaintiff filed a Title II application for disability insurance benefits, alleging a period of disability beginning on December 28, 2018. (AR at 24). Her claim was initially denied on December 4, 2019, and again upon reconsideration on April 16, 2020. (*Id.*). Plaintiff testified at a telephonic administrative hearing on February 10,

---

[1] Administrative Record (*see* Doc. 11).

2021 (AR at 47–72), after which the ALJ found Plaintiff was not disabled from December 28, 2018 through April 13, 2021 (AR at 42). In making this finding, the ALJ concluded that Plaintiff passed the first three steps in demonstrating a disability: (i) Plaintiff has *not* engaged in substantial gainful activity since the alleged onset date (AR 27); (ii) Plaintiff has two "severe" medically determinable impairments (degenerative disc disease and obesity) (AR 27); and (iii) Plaintiff does *not* have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations, and Plaintiff has the residual functional capacity ("RFC") to perform light work with a few specific exceptions (AR 27–28). At step four of the analysis, the ALJ found that Plaintiff is capable of performing past relevant work and is therefore not disabled. (AR 41–42).

On March 30, 2022, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the agency's final decision. (AR at 1). On May 17, 2022, Plaintiff timely filed this action for review of the ALJ's decision. (Doc. 1). On August 12, 2022, the Court received the administrative record. (Doc. 11). On October 11, 2022, Plaintiff filed her Opening Brief (Doc. 12). On December 8, 2022, Defendant filed its Response Brief (Doc. 16). On December 15, 2022, Plaintiff filed her Reply Brief (Doc. 17). This Court has fully reviewed the parties' briefing and the medical record and will discuss the pertinent medical evidence in addressing the issues raised by the parties.

**II.    LEGAL STANDARD**

A person is considered "disabled" for the purpose of receiving social security benefits if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion. *Id*. To determine whether substantial evidence supports a decision, the Court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id*. (citation omitted). Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520(a)). The claimant bears the burden of proof on the first four steps, and the burden shifts to the Commissioner at step five. *Id*. At step *one*, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. § 404.1520(a)(4)(i). At step *two*, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). At step *three*, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in the regulations.[2] § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id*. If not, the ALJ determines the claimant's residual functional capacity ("RFC"). §§ 404.1520(e), 416.920(e). At step *four*, the ALJ determines whether the claimant's RFC precludes her from performing her past relevant work. § 404.1520(a)(4)(iv). If so, the ALJ proceeds to the *fifth* and final step, where they determine whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. § 404.1520(a)(4)(v). If not, the claimant is disabled. *Id*.

**III.   DISCUSSION**

The first issue on this administrative appeal is whether the ALJ erred by finding the medical opinions of treating primary care provider Sarah DeRubeis, FNP-C ("NP

---

[2] The impairments "listed in the regulations" are found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.

DeRubeis") and treating surgeon Randal Porter, M.D. ("Dr. Porter") to be wholly or partially unpersuasive. (Doc. 12 at 11). Plaintiff argues that the ALJ failed to meaningfully address the supportability and consistency factors in explaining her decision to reject their medical opinions and, as a result, failed to adequately explain her persuasiveness finding with substantial evidence. (*Id.*). The second issue is whether the ALJ erred by rejecting Plaintiff's symptom testimony. (*Id.* at 19). Plaintiff argues that the ALJ rejected Plaintiff's symptom testimony without providing specific, clear, and convincing reasons supported by substantial evidence from the record. (*Id.*). Plaintiff primarily requests that this case be remanded for a calculation and award of benefits, but alternatively requests a remand for further proceedings. (*Id.* at 25). Defendant argues that the Court should affirm the ALJ's decision because substantial evidence supports the ALJ's decisions with respect to the medical opinions and Plaintiff's symptom testimony, and because the ALJ did not commit any harmful error. (Doc. 16 at 2). If the Court were to find in Plaintiff's favor, Defendant argues that remand for calculation of benefits is not appropriate and requests that this matter be remanded for further proceedings. (*Id.* at 13–15).

### A. Medical Opinions

Under the relevant regulations, an ALJ is required to articulate her consideration of each medical opinion, including how persuasive each opinion is according to several enumerated factors, including (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c). The most important factors in evaluating persuasiveness are the first two: supportability and consistency. *See* §§ 404.1520c(a), 416.920c(a). In fact, consideration of these factors is mandatory, as the ALJ *must* explain how he or she considered the "supportability" and "consistency" factors for each medical source's opinion. § 404.1520c(b)(2). As to "supportability," the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions

. . . will be." § 404.1520c(c)(1). As to "consistency," the regulations provide that "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." § 404.1520c(c)(2).

### 1. NP DeRubeis

On February 2, 2021, NP DeRubeis completed two medical source statements assessing Plaintiff's physical capacities and workplace restrictions. (AR 2217–30). The first addressed restrictions related to Plaintiff's lumbar spine impairments (AR 2217–23) and the second addressed restrictions related to Plaintiff's cervical spine impairments (AR 2224–30). In the first medical source statement, NP DeRubeis began by noting that she had been treating Plaintiff since July 2019. (AR 2218). She noted diagnoses of lumbar stenosis and L5-S1 fusion. (*Id.*). With respect to clinical findings, laboratory and test results showing Plaintiff's impairments, NP DeRubeis identified pain, numbness, tingling, and an MRI from six months prior. (*Id.*). NP DeRubeis found that Plaintiff's impairments have lasted or can be expected to last at least twelve months and she identified Plaintiff's symptoms as pain, fatigue, and weakness. (*Id.*). She further noted that the pain was "achy/sharp [with] numbness [and] heaviness." (*Id.*). NP DeRubeis then listed a number of "positive objective signs" supporting her conclusions: reduced lumbar sacral range of motion, abnormal gait, sensory loss, tenderness, muscle spasm, muscle weakness, weight change, and impaired sleep. (AR 2219). She opined that emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, and listed anxiety as a side effect of medications that may have implications on working. (*Id.*). NP DeRubeis concluded that Plaintiff could not walk any city blocks without rest or severe pain, that she could sit for only 30 minutes before needing to get up, that she could stand for only 20 minutes before needing to sit down or walk around, and that Plaintiff could only sit, stand, or walk for less than two hours in an eight-hour workday. (*Id.*). She concluded that Plaintiff was unable to work as a result of her limitations. (AR 2220–21). NP DeRubeis further opined that Plaintiff could *never* lift or carry even less than ten pounds or climb ladders

and stairs. (AR 2221). She opined that Plaintiff could only *rarely* twist, stoop and bend, or crouch and squat. (*Id.*). NP DeRubeis found that, during an eight-hour workday, Plaintiff could use her fingers for fine manipulations 100 percent of the time, her arms to reach in front of her body 75 percent of the time, her hands to grab, turn, and twist objects 50 percent of the time, and her arms to reach overhead 50 percent of the time. (AR 2221–22). She concluded that Plaintiff's symptoms would interfere with Plaintiff's attention and concentration rendering her "off task" for 25 percent or more of the time during a typical workday. (AR 2222). NP DeRubeis concluded that Plaintiff was incapable of even low stress work because of poor focus and ongoing pain. (*Id.*).

In the second medical source statement, NP DeRubeis began by noting Plaintiff's diagnosis as cervical stenosis with chronic pain and paresthesia. (AR 2225). She noted symptoms of bilateral upper extremity pain, weakness, paresthesia, muscle weakness, chronic fatigue, sensory changes, lack of coordination, motor loss, and reduced grip strength. (*Id.*). She opined that Plaintiff had significant limitations of motion, including cervical ranges of motion of 15 percent extension, 15 percent flexion, 25 percent left and right rotation, and 15 percent left and right lateral bending. (*Id.*). She noted that Plaintiff had severe headache pain—specifically frontal achiness and pounding—associated with the impairments of her cervical spine and that such headaches lasted one to two days and occurred approximately three to four times per month. (AR 2226). She listed vertigo, inability to concentrate, impaired sleep, and mood changes as symptoms associated with the headaches. (*Id.*). NP DeRubeis listed dizziness and brain fogginess as medication side effects expected to affect working. (*Id.*). As with her first medical source statement, NP DeRubeis concluded that Plaintiff's impairments were expected to last at least twelve months and that emotional factors including anxiety affected Plaintiff's symptoms, functional limitations, and physical condition. (AR 2226–27). NP DeRubeis opined that Plaintiff cannot walk city blocks, could sit or stand for only 30 minutes at a time, and that she could only sit, stand or walk for less than two hours in an eight-hour workday. (AR 2227). She concluded that Plaintiff could *never* lift even less than ten pounds or climb

ladders and stairs, and that Plaintiff could only *rarely* twist, stoop and bend, or crouch and squat. (AR 2229). She also concluded that Plaintiff could only *occasionally* look down (*i.e.*, sustained flexion of her neck), turn her head to the right or left, look up, or hold her head in a static position. (*Id.*). NP DeRubeis made the same conclusions with respect to the percentage of time in a typical day that Plaintiff could use her fingers for fine manipulations (100 percent), her arms for reaching in front of her body (75 percent) and overhead (50 percent), and her hands for grasping, turning, and twisting objects (50 percent). (*Id.*). She again opined that Plaintiff's poor focus and ongoing pain left Plaintiff incapable of even low stress work, that Plaintiff would be "off task" 25 percent or more of the time during a typical workday because of attention and concentration issues, and that Plaintiff was overall unable to work as a result of her impairments. (AR 2230).

In the decision, the ALJ found NP DeRubeis' opinions in the two medical source statements to be unpersuasive. (AR 40). The ALJ reasoned that the opinions were "unsupported by [NP DeRubeis'] own physical examination findings" during two previous examinations on September 3 and November 11, 2020. (*Id.*). The ALJ also found that the opinions were "inconsistent with the medical evidence record" from a follow-up examination that took place on December 15, 2020. (*Id.*). Aside from these three examinations, the ALJ did not cite to any other evidence from the medical record. (*Id.*).

Plaintiff argues that the ALJ did not properly consider the supportability factor prescribed in the regulations because the ALJ merely relied on "two isolated [treatment] notes, one of which was completely unrelated to [Plaintiff]'s spinal impairments, and one that was *supportive* of NP DeRubeis'[] assessments related to spinal impairments." (Doc. 12 at 13–14 (emphasis in original)). Plaintiff argues that the ALJ did not explain how these two isolated treatment notes failed to sufficiently support NP DeRubeis' work-preclusive assessments, which Plaintiff contends were supported by numerous other treatment notes in the record. (*Id.* at 14–15). Plaintiff also argues that the ALJ did not properly consider the consistency factor prescribed in the regulations because the only "inconsistent" evidence that the ALJ cited to was the December 15, 2020 follow-up examination. (*Id.* at

7

15). Plaintiff contends that the December 15, 2020 examination actually *supports* NP DeRubeis' work-preclusive assessments when viewed as a whole and in the proper context, which Plaintiff argues the ALJ failed to do. (*Id.*). Plaintiff argues that this single examination fails to "provide a sufficient inconsistency supported by substantial evidence to undermine the validity of NP DeRubeis'[] assessments." (*Id.* at 16).

The Court finds the ALJ failed to adequately explain how she considered the supportability and consistency factors. *See Woods*, 32 F.4th at 792 (alterations in original) (citations omitted) ("The agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source and 'explain how [it] considered the supportability and consistency factors' in reaching these findings."). Like in *Woods*, it appears the ALJ here used the terms "supported" and "consistent" interchangeably, but "supportability" and "consistency" are terms of art under the regulations. *See id.* at 793 n.4. The Court finds that the ALJ's consistency finding is not supported by substantial evidence, and that the ALJ failed to make any meaningful finding at all with respect to the supportability factor.

### a. Consistency

Proper analysis of the consistency factor requires the ALJ to evaluate the extent to which NP DeRubeis' opinions are consistent with the medical or nonmedical evidence elsewhere in the record. *See* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."); *see also Lewis v. Comm'r of Soc. Sec. Admin.*, No. CV-21-00268-TUC-RCC (JR), 2022 WL 4008026, at *6 (D. Ariz. Sept. 2, 2022) (citing 20 C.F.R. § 404.1520c(c)(2)) (Whereas supportability examines evidence presented by the source, "[c]onsistency examines the evidence from *other* medical and nonmedical sources."). In her decision, the ALJ cited to inconsistencies between the findings made during three previous examinations in late 2020 and NP DeRubeis' February 2021 opinions in the two medical source statements. (*See* AR 40).

During a physical examination on September 3, 2020, NP DeRubeis found that

Plaintiff's general appearance was "[n]ormal" and that she was "[h]ealthy, well nourished, and in no apparent distress." (AR 678). She noted that Plaintiff's musculoskeletal symptoms were "[n]ormal" and that her gait was "smooth with equal stride and [a] good base of support." (*Id.*). To an extent, these findings are inconsistent with NP DeRubeis' findings five months later—in the medical source statements—that Plaintiff was, among other things, experiencing symptoms of pain, an abnormal gait, and reduced ranges of motion. (*See* AR 2218–30). The significance of such inconsistencies, however, is at least somewhat undermined by the fact that the September examination was for a general, routine gynecological examination rather than being focused on Plaintiff's lumbar or cervical symptoms and impairments.

During a follow-up examination regarding menopause on November 11, 2020, NP DeRubeis noted "[n]o impairments" with respect to Plaintiff's functional and cognitive status and that Plaintiff's general appearance was "healthy and in no apparent distress." (AR 671). Again, to a certain extent, these findings are indeed inconsistent with NP DeRubeis' February 2021 medical source statements which noted numerous functional impairments and symptoms of pain associated with her cervical and lumbar spine. (*See* AR 2218–30). As with the September examination, however, the significance of such inconsistences is undermined by the purpose of the November follow-up examination. Rather than being focused on Plaintiff's lumbar and cervical impairments, the November examination concerned menopause and Plaintiff's inquiries into hormone replacement therapy. (AR 669, 671). Moreover, the November examination included *other* findings that are actually *consistent* with NP DeRubeis' medical source statements. Specifically, NP DRubeis noted "low back pain" and decreased lumbar and cervical ranges of motion in assessing Plaintiff's "abnormal" musculoskeletal symptoms. (AR 670, 672). She also noted that Plaintiff was scheduled for a December 1, 2020 spinal stimulator procedure and completed a temporary handicap plaque as requested by Plaintiff. (AR 672).

During a December 15, 2020 follow-up telehealth examination with Nurse Practitioner Julie Supple two weeks after her spinal stimulator procedure, Plaintiff was able

9

to lift her arms above her head and perform bicep and tricep maneuvers and fine motor skills without difficulty. (AR 2170). She was also able to lift her knees, stand on her toes and heels, ambulate the room, march in place, and tap her toes without difficulty. (*Id.*). Her general appearance was "healthy – alert – and no acute distress" and her gait was "normal." (*Id.*). Plaintiff was instructed to begin a formalized walking plan, starting with fifteen minutes per day and increasing by five minutes every three-to-five days to a maximum of forty minutes per day. (AR 2171). As with the September and November examinations, these findings are, to some extent, inconsistent with NP DeRubeis' February 2021 medical source statements. Moreover, the December examination was specifically focused on the condition of Plaintiff's cervical and lumbar spine, so the significance of such inconsistencies is not undermined by the purpose of the examination, as it was with the September and November examinations. That said—and as with the November examination—the December examination also included findings that were arguably *consistent* with NP DeRubeis' February 2021 opinions. For example, Plaintiff complained of headaches, fatigue, anxiety, pain in the left neck, difficulty sleeping, and a regular need for and use of pain medications. (AR 2166, 2169). Plaintiff was also ordered to continue wearing the cervical collar and bone stimulator, appear for x-rays in January 2021, and follow up with Dr. Porter. (AR 2171).

In sum, each of the September, November, and December 2020 examinations contained some findings that were at least somewhat inconsistent with NP DeRubeis' February 2021 opinions. Whereas NP DeRubeis identified an abnormal gait in February 2021, Plaintiff was described as having a "normal" and "smooth" gait during the 2020 examinations. Likewise, NP DeRubeis' noted pain, numbness, fatigue, and weakness as symptoms Plaintiff was experiencing in February 2021, but the 2020 examinations noted a "normal" and "healthy" general appearance and no apparent distress. However, the Court cannot find that such relatively minor inconsistencies amount to *substantial* evidence sufficient to entirely reject NP DeRubeis' February 2021 opinions. As noted above, Plaintiff's spinal impairments and related symptoms were not even the primary focus of

the September and November examinations. Rather, the September 2020 examination was a routine gynecological examination, and the November 2020 examination was focused on Plaintiff's menopause. Thus, it is rather unsurprising that the September and November findings did not contain much information as it relates to the condition of Plaintiff's spine. Also as noted above, the 2020 examinations contain almost as many *consistencies* with NP DeRubeis' February 2021 opinions as they do inconsistencies. The November examination, for example, noted Plaintiff's low back pain and decreased ranges of motion—symptoms that were noted in NP DeRubeis' medical source statements. Likewise, the December functional findings—that Plaintiff was able to lift her arms above her head, perform certain upper extremity maneuvers and fine motor skills without difficulty, lift her knees, stand on her toes and heels, ambulate the room, march in place, and tap her toes—can plausibly be read as *consistent* with NP DeRubeis' medical source statements, which did *not* find that Plaintiff was entirely unable to perform such functions but rather that Plaintiff was merely limited in her ability to perform such functions for extended periods of time. Thus, the fact that Plaintiff could ambulate the room and march in place in December 2020 is not inconsistent with NP DeRubeis' February 2021 finding that Plaintiff could only sit, stand, or walk for less than two hours out of an eight-hour workday. Similarly, the fact that Plaintiff could lift her arms above her head in December 2020 does not wholly contradict NP DeRubeis' February 2021 finding that Plaintiff could reach her arms above her head only 50 percent of the time during a typical eight-hour workday.

The ALJ cited only to the above three examinations as being inconsistent with NP DeRubeis' opinions. (*See* AR 40). The Court finds that the three examinations do not amount to *substantial* evidence of inconsistency, given that their findings were only partially inconsistent—and, in many respects, *consistent*—with NP DeRubeis' February 2021 medical source statements. Although the ALJ was not necessarily required to compare and contrast NP DeRubeis' opinions with every other medical opinion in the record to meet her burden on the consistency factor, the Court finds that the three examinations the ALJ *did* rely on were insufficient to find NP DeRubeis' opinions wholly

inconsistent with the record, particularly given the substantial evidence in the record that is consistent with the spinal impairments and related symptoms and limitations noted by NP DeRubeis.

### b. Supportability

"Supportability means the extent to which a medical source supports the medical opinion by explaining the relevant objective medical evidence." *Woods*, 32 F.4th at 791–92 (alterations omitted). The supportability factor, as this Court understands it, goes directly to whether, or to what extent, the source explained her opinion or conclusions by providing or citing objective supporting evidence. *Id.*; *see also Lewis*, 2022 WL 4008026, at *6 (citing 20 C.F.R. § 404.1520c(c)(1)) ("Supportability examines the relevant objective medical evidence and supporting explanations presented by the source."). The ALJ here did not explicitly address the supportability factor. Rather than considering the objective supporting evidence that NP DeRubeis relied on to reach her opinions, the ALJ only found that NP DeRubeis' February 2021 opinions were "unsupported by her own physical examination findings" on September 3, 2020 and on November 11, 2020. (AR 40). NP DeRubeis' February 2021 opinions, however, did not make any mention of the September or November 2020 examinations, let alone cite to the findings of those examinations as supportive of her opinions. As a result, the ALJ's comparison of the September and November examination findings with NP DeRubeis' February 2021 opinions speaks more directly to the issue of consistency than it does to supportability.

The Court notes that NP DeRubeis' February 2021 medical source statements consisted mostly of short answers to specific questions and "check the box" conclusions, making it somewhat difficult to identify what objective medical evidence she relied on to make her conclusions. (*See* AR 2232–41). However, this did not relieve the ALJ of her duty to consider supportability. At the least, the ALJ could have explained that the medical source statements lacked direct citations or references to objective medical evidence, and that they were therefore unsupported. The ALJ did not do so, however, and instead simply referenced previous examinations that she found to be inconsistent; again, such an analysis

is more closely characterized as an inconsistency analysis than a supportability analysis.

To an extent, it can be said that NP DeRubeis' medical source statements were based on her own examinations of Plaintiff. In this way, the ALJ's consideration of the September and November examinations *could* be considered a supportability analysis. However, NP DeRubeis examined Plaintiff numerous *other* times over the course of nearly two years, and a sufficient supportability analysis would have considered the extent to which these other examinations supported or failed to support NP DeRubeis' opinions. Moreover, and as explained above with respect to the consistency factor, the September and November examinations were, in many ways, *supportive* of NP DeRubeis' February 2021 opinions. The ALJ failed to consider this by finding the September and November examinations wholly "unsupportive" of NP DeRubeis' opinions in the medical source statements.

In sum, the Court finds that the ALJ failed to meaningfully articulate how she considered the supportability factor in her analysis because she did not address the degree to which NP DeRubeis supported her opinions in the medical source statements with objective medical evidence. *See* 20 C.F.R. § 404.1520c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision.").

### 2. Dr. Porter

On February 8, 2021, Dr. Porter completed two medical source statements assessing Plaintiff's physical capacities and workplace restrictions. (AR 2217–30). The first addressed restrictions related to Plaintiff's lumbar spine impairments (AR 2232–35) and the second addressed restrictions related to Plaintiff's cervical spine impairments (AR 2237–41). In the first medical source statement, Dr. Porter began by noting that he had been seeing Plaintiff every two months for cervical myelopathy and lumbar spondylolisthesis. (AR 2232). He stated that her prognosis was "good." (*Id.*). Dr. Porter listed cervical and lumbar MRIs as "clinical findings, laboratory and test results" showing Plaintiff's impairments. (*Id.*). He opined that Plaintiff's impairments had lasted or could be expected to last at least twelve months. Dr. Porter then listed a number of "positive

objective signs" supporting his conclusions: reduced range of motion, positive straight leg raising, abnormal gait, sensory loss, reflex changes, tenderness, and muscle weakness. (AR 2233). He opined that emotional factors did *not* contribute to the severity of Plaintiff's symptoms and functional limitations, and he did not identify any side effects of any medications Plaintiff was taking that would have implications for working. (*Id.*). Dr. Porter found that Plaintiff could be expected to walk four city blocks without rest or severe pain. He further found that she could sit for 45 minutes before needing to get up and stand for 30 minutes before needing to sit down or walk around. (*Id.*). Dr. Porter opined that Plaintiff could be expected to sit, stand, or walk for less than two hours total in an eight-hour workday, and that Plaintiff needed a job that permitted shifting positions at will from sitting, standing, or walking. (*Id.*). He concluded that she would need to walk every 30 minutes for approximately 13 minutes but would not need unscheduled breaks during a workday. He opined that she would not need to elevate her legs with prolonged sitting and that she did not need a cane or other assistive device. (AR 2234). He concluded that Plaintiff could *occasionally* lift and carry less than ten pounds. He also concluded that Plaintiff could only occasionally "twist," but *never* stoop, bend, crouch, squat, or climb ladders and stairs. (*Id.*). He estimated that Plaintiff would likely be off task approximately 15 percent of the total workday as a result of her symptoms. (AR 2235). He concluded that Plaintiff was "[c]apable of moderate stress – normal work" and that she was likely to be absent from work about one day per month as a result of her impairments. (*Id.*).

In the second medical source statement, Dr. Porter began by noting that he had been seeing Plaintiff every three months for cervical spondylolisthesis. (AR 2237). He stated that her prognosis was "good" while also noting that she had chronic pain and paresthesia. (*Id.*). Dr. Porter identified tenderness, muscle weakness, chronic fatigue, lack of coordination, and motor loss as the symptoms associated with Plaintiff's cervical spine impairments. (*Id.*). He noted that she had a "significant" limitation of motion, specifying that she had a 20 percent cervical range of motion in extension, 25 percent in flexion, 20 percent in left and right rotation, 25 percent in left lateral bending, and 20 percent in right

lateral bending. (*Id.*). He indicated that Plaintiff did *not* have severe headache pain associated with her cervical impairments. (AR 2238). Dr. Porter noted that Plaintiff had surgery—a C4-C7 anterior cervical discectomy and fusion—on December 1, 2020, and that her impairments had lasted or could be expected to last at least twelve months. (*Id.*). He again noted that emotional factors did *not* contribute to the severity of Plaintiff's symptoms and functional limitations. (*Id.*). He found that Plaintiff could walk approximately four city blocks without rest or severe pain. (AR 2239). He also found that Plaintiff could sit for 30 minutes at a time and stand for 30 minutes at a time. (*Id.*). In total, he found that Plaintiff could sit, stand, or walk for about two hours total in an eight-hour workday. (*Id.*). He opined that Plaintiff needed a job that permitted shifting positions at will from sitting, standing, and walking, and that she needed to include periods of walking during an eight-hour workday. (*Id.*). Specifically, Dr. Porter found that Plaintiff needed to walk every 90 minutes for at least five minutes, and that she would need unscheduled breaks for ten minutes approximately one to two times per working day. (*Id.*). He found that Plaintiff could only occasionally lift less than ten pounds. (AR 2240). He found that Plaintiff could only occasionally look down (sustained flexion of neck), but that she could frequently turn her head left or right, look up, and hold her head in a static position. (*Id.*). He found that she could *occasionally* twist, stoop, and bend, *rarely* crouch and squat, and *never* climb ladders or stairs. (*Id.*). Dr. Porter opined that Plaintiff had "significant limitations with reaching, handling, or fingering." (*Id.*). Specifically, he noted that plaintiff could use her upper extremities—both left and right hands, fingers, and arms—to grasp, turn, and twist objects, make fine manipulations, reach in front of her body, and reach overhead approximately 20 percent of the time during an eight-hour workday. (*Id.*). He noted that she would be off task approximately five percent of the typical workday as a result of severe symptoms interfering with her attention and concentration. (AR 2241). Dr. Porter concluded that Plaintiff was "[c]apable of moderate stress – normal work" and that her impairments were likely to produce both good days and bad days. (*Id.*).

In the decision, the ALJ found Dr. Porter's opinions in his medical source statements

to be "somewhat persuasive." (AR 40). The ALJ explained her reasoning as follows:

> The opinions of Dr. Porter[,] . . . rendered just nine weeks after her cervical spine surgery, are *somewhat persuasive* as it pertains to the claimant's post-operative period as it is consistent with her post-operative discharge restrictions, including no bending, lifting, or twisting, and no strenuous activity, and her cervical collar was to be worn at all times when out of bed except for showering and eating[,] . . . and supported by her post-operative follow up encounter where the claimant was able to lift her arms above her head and perform biceps and triceps maneuvers and fine motor skill activities without difficulty. She could lift her knees, stand on toes and heels, march in place, tap toes, and ambulate in the room without difficulty. Her gait was normal. She was instructed to begin a formalized walking plan, starting with 15 minutes per day, increased by five minutes every three to five days to a maximum of 40 minutes per day.

(AR 40–41 (internal citations omitted) (emphasis added)).

Plaintiff argues that the ALJ did not sufficiently explain her persuasiveness finding with respect to Dr. Porter's February 2021 opinions in part because she "failed to say which of Dr. Porter's opinions were persuasive, and which were rejected as unsupported or inconsistent with the record." (Doc. 12 at 16). The Court agrees. As seen above, the ALJ's analysis states that Dr. Porter's opinions are "somewhat persuasive as it pertains to the claimant's post-operative period" and then proceeds to mention only the specific aspects of Dr. Porter's February 2021 opinions that she found persuasive—that is, those portions which the ALJ found to be consistent with Plaintiff's post-operative discharge restrictions and supported by her post-operative follow up encounter on December 15, 2020. (AR 40–41). The above-excerpted paragraph—which constitutes the entirety of the ALJ's persuasiveness analysis as it relates to Dr. Porter's opinion—does not identify any portion of Dr. Porter's February 2021 opinions which the ALJ found to be *inconsistent* with or *unsupported* by the record. Consequently, the ALJ failed to provide any explanation for why she found Dr. Porter's opinions to be *somewhat* persuasive as opposed to fully or mostly persuasive.

The ALJ's use of the word "somewhat" cannot be overlooked as superfluous either,

as the ALJ specifically found other medical opinions to be "persuasive" or "mostly persuasive" earlier in the decision. For example, the ALJ found the opinions of Dr. Foster-Valdez and Dr. Schwartz—two non-treating, state-agency mental health disability consultants—to be "persuasive." (AR 40). Likewise, the ALJ found the opinions of Dr. Combs and Dr. McKay—two non-treating, state-agency disability consultants—to be "mostly persuasive." (*Id.*). Notably, the ALJ identified the specific aspects of Dr. Combs and Dr. McKay's opinions that she found persuasive (Dr. McKay's opinion as to Plaintiff's preclusion of climbing ladders, ropes, and scaffolds) and that she found less persuasive (Dr. Combs and Dr. McKay's conclusions that Plaintiff was "limited" in reaching overhead and "unlimited" in handling; the ALJ found that Plaintiff's symptoms supported *frequent* reaching and handling). (*See id.*). The ALJ did not do the same for Dr. Porter, despite finding Dr. Porter's opinions only "somewhat persuasive," clearly implying that certain portions or aspects of his opinions were less persuasive or unpersuasive altogether.

The Court finds the ALJ failed to adequately explain how she considered the supportability and consistency factors in finding certain aspects of Dr. Porter's opinions less persuasive or unpersuasive altogether. *See Woods*, 32 F.4th at 792 (alterations in original) (citations omitted) ("The agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source and 'explain how [it] considered the supportability and consistency factors' in reaching these findings.").

### c. Symptom Testimony

Given this Court's finding that the ALJ erred in evaluating the medical opinion evidence of NP DeRubeis and Dr. Porter, the Court need not address Plaintiff's arguments with respect to the ALJ's rejection of Plaintiff's symptom testimony. *See Garcia v. Comm'r of Soc. Sec. Admin.*, No. CV-20-08258-PCT-DLR, 2021 WL 5822642, at *4 (D. Ariz. Dec. 8, 2021) ("Because the Court has found error in the consideration of the medical opinions as discussed above, which necessarily impacts the ALJ's RFC finding, the Court will not consider Plaintiff's other argument as the ALJ will need to reassess Plaintiff's RFC on remand.").

### IV. CONCLUSION

The Court finds that the ALJ's persuasiveness determinations with respect to NP DeRubeis and Dr. Porter were *not* supported by substantial evidence and failed to adequately consider the supportability and consistency factors as required by the regulations. "These errors are harmful because this Court cannot confidently conclude that no reasonable ALJ, when fully crediting [NP DeRubeis] and [Dr. Porter]'s opinions, could have reached a different disability determination." *Lewis*, 2022 WL 4008026, at *7 (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) ("[A] reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.")). Thus, the Court reverses the ALJ's decision. In its discretion, the Court remands for further proceedings consistent with this opinion. *See Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014) (The Court has "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.").

Accordingly,

**IT IS ORDERED** that the April 13, 2021 final decision (AR 24–42) of the Commissioner of Social Security is **reversed** and this matter is **remanded** to the Commissioner of Social Security for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and **terminate this action**.

Dated this 15th day of May, 2023.

Honorable Steven P. Logan
United States District Judge